**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 10-CR-55-CVE |
| ) | |
| ARTHUR HERBERT RAYMOND, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Now before the Court is Defendant's Motion to Suppress and Brief in Support (Dkt. # 12). Defendant argues that he did not voluntarily consent to a warrantless search of his home on January 6, 2010, and firearms and ammunition seized during the search should be suppressed. The government responds that police received defendant's free and voluntary consent before initially entering his home and subsequently conducting a full search of the premises.

**I.**

On January 6, 2010, Corporal Douglas Alan Davis, Jr. and Deputy Bill Blackwell of the Mayes County Sheriff's Office (Sheriff's Office) were reviewing reports or tips that the Sheriff's Office had received concerning the alleged sale of marijuana from a residence in Spavinaw, Oklahoma. The reports provided an address for the residence, but did not identify the person who was allegedly distributing marijuana. Davis and Blackwell decided to investigate the tips and, at about 2:30 p.m., drove to a residence located at 4535 N.E. 455 Drive in Spavinaw.[1] They were wearing plain clothes with a badge and firearm on their belts, and drove an unmarked white Dodge

---

[1] Davis states that he "went" to Raymond's house at 2:30 p.m., not that he arrived at that time.

pickup truck belonging to the Sheriff's Office. Davis testified that driveway to the property was secured by a gate, but the gate was open when they arrived. Davis drove the pickup truck up the driveway, and states that he parked 15 to 20 yards from the house near a lean-to or car shed. Davis saw a person look out of a window when they arrived. Davis approached the house alone and Blackwell remained at the vehicle. Davis testified that he did not want both officers to approach the house, because he did not feel that there was a need for more than one officer. He observed between five and seven pit bull dogs outside of the house, and all of the dogs appeared to be chained.

Davis testified that he knocked on the door and Arthur Raymond opened the door. Davis asked Raymond if he knew a man named "Bob" and asked if he lived nearby. Raymond stepped out onto the porch and closed the door behind him. Davis claims that he immediately smelled marijuana and told Raymond about his observation. Davis asked Raymond if he could come into the house to look for marijuana, and Raymond told Davis that he had a little marijuana in the living room and had been smoking marijuana before Davis arrived. Raymond allowed Davis to come into the house to look for marijuana in the living room. Before entering the home, Davis called Blackwell on his cell phone and asked Blackwell him to accompany Davis into the house. Davis observed two or more large dogs in the house, and asked Raymond to secure the dogs while he searched the living room. Davis followed Raymond while he secured the dogs in a back bedroom. Davis testified that Raymond voluntarily showed him a pipe and some marijuana in the living room, but Davis said that he thought that Raymond had more marijuana in the house. Raymond denied Davis's suggestion. Davis asked Raymond to accompany him outside while Raymond began the process of requesting a search warrant for the house. Raymond's fiancé, Janetta Cooper, was also present, and she accompanied Davis, Blackwell, and Raymond outside. Davis testified that he and Blackwell were

in the house for about 10 minutes before asking Raymond and Cooper to step outside. Raymond and Cooper were handcuffed at some point during the encounter.

Davis initially testified that he was outside with Raymond and Cooper for about 10 minutes, but later testified that they may have been outside for 15 or 20 minutes. Raymond has produced evidence that it was approximately 35 degrees Fahrenheit in nearby Grove, Oklahoma during the relevant time period on January 6, 2010. Davis claims that he escorted Raymond to the lean-to or car shed near the house, and asked Raymond to consent to a full search of his home. Raymond stated that he would consent to a search. Davis read a <u>Miranda</u> warning to Raymond from a pre-printed form and asked Raymond if he understood his rights. Raymond acknowledged that he understood his <u>Miranda</u> rights and signed a written <u>Miranda</u> waiver. Government Exhibit No. 1. Davis also asked Raymond to sign a written consent form allowing Davis to search Raymond's home, and Raymond signed the consent form. Government Exhibit 2. Both the <u>Miranda</u> waiver and consent form were signed at 2:57 p.m. on January 6, 2010. Davis also asked Cooper to sign a <u>Miranda</u> waiver and consent form, and she signed both forms about seven minutes later. Government Exhibits 4 and 5.

Davis, Blackwell, Raymond, and Cooper returned to the house and went inside. Davis claims that Raymond was cooperative and showed Davis where marijuana was hidden in the bathroom. Before searching the master bedroom, Raymond moved the dogs into his daughter's room while Davis searched the master bedroom. Davis saw a .22 caliber rifle leaning against a wall in the master bedroom. Raymond stated that Cooper's son had given her the rifle. Davis asked Raymond if there were any other firearms in the house, and Raymond told Davis that there was a handgun under a recliner cushion in the master bedroom. Davis found a loaded .22 caliber revolver

under the cushion, and he observed that the serial number on the gun had been obliterated. Davis seized both guns and all of the marijuana found in the house, and called the Sheriff's Office to request a deputy to transport Raymond to the Sheriff's Office. Before Raymond was transported to the Sheriff's Office, a young man approached the house with a bowl of deer chili. Davis asked the young man to leave, but did not ask for his name.

When they arrived at the Sheriff's Office, Raymond was taken to Davis' office and Lieutenant Albert McKee also went to Davis' office. McKee again advised Raymond of his Miranda rights, and Raymond initialed his original Miranda waiver at 4:20 p.m. to show that he been advised of Miranda rights a second time. Government Exhibit 1 (containing the notation "16:20 AR" to reflect that Raymond was advised of his Miranda rights before talking to Davis and McKee). Davis told Raymond about the reports received by the Sheriff's Office. Raymond told Davis that he occasionally sold small amounts of marijuana to friends, and he also traded marijuana for deer chili and Xanax. He also told Davis that the .22 caliber revolver belonged to "David Smith." He claimed that Smith dropped the gun off at Raymond's house about four or five years before, but had never returned to pick up the gun. Davis asked Raymond to complete a written statement, and Raymond wrote:

> On this day of 1-6-10 I gave permition to sherch my house For pot I gave them my smoke I smoke pot For pain in my back. I sometimes give and Trade for deer chilly. I do not sell it is for my own use. I did Trade For some "zanex." The gun rifle 22 is Janetta's from her son she has reciet. The pistol was gave to me from David Smith 4 years ago.[2]

---

[2] Due to the numerous spelling and grammatical errors, defendant's written statement has been copied verbatim as in the original.

4

Government Exhibit 3. Davis testified that he did not assist Raymond with the drafting of the statement, but McKee noted the date and time of the statement on the form. Raymond was transported to the Mayes County jail for booking.

Raymond called three witness presenting a very different version of the events of January 6, 2010. Josh Loftis is a friend of Jeremy Raymond, defendant's son, and was waiting in Jeremy Raymond's room when Davis approached the house. Jeremy Raymond's room was described as an "add-on" room near the front of the house. Loftis claims that he did not see anyone smoking marijuana or smell marijuana in the house. Loftis testified that Davis and Blackwell had been in the house for a short time before they knew Loftis was present. Loftis did not hear any raised voices and he believed that Raymond was cooperating with the police. Loftis claims that he waited outside in the "freezing cold" for about 40 minutes, but he did not have a clear idea of what was happening. He did observe Raymond meet with Davis near the lean-to or car shed, and saw Raymond sign a form. At some point, Loftis asked Davis if he could leave. Davis told Loftis to leave and told Loftis that he did not want to find Loftis in place like that again. Loftis was not handcuffed at any time, nor did Davis threaten to arrest him. Loftis testified that Raymond was placed in handcuffs before being transported to the Sheriff's Office, but he did not mention whether Cooper was handcuffed.

Cooper testified that she is Raymond's fiancé and was living at the house on January 6, 2010. She saw a white truck come up the driveway, and claims that the truck was parked off of the driveway in between the house and the car shed. Raymond looked out of the living room window and saw Davis approach the house. Davis attempted to speak to Raymond through a window, but Raymond said he could not hear Davis. Raymond told Davis to come to the door, and Raymond went to the front porch to talk to Davis. About three or four minutes later, Cooper was standing in

5

the kitchen when Raymond, Davis, and Blackwell came into the house. She testified that Davis and Blackwell were immediately aware of Loftis' presence and he was standing the kitchen during the initial search of the home. Davis and Blackwell looked around the living room and Raymond asked them to stop searching after a few minutes. She claims that Davis placed Raymond under arrest, and Davis handcuffed Cooper with her hands behind her back. Davis told both Raymond and Cooper that they would remain handcuffed until could get a warrant and complete his search of the house. Davis and Blackwell escorted them outside, and asked them to stand near the white truck.

Cooper testified that it was "freezing cold" outside and she had to wait outside for at least 40 minutes. She suffers from emphysema and has had part of both lungs removed, and this makes her sensitive to cold weather. She did not tell Davis or Blackwell that she had emphysema, but she claims that Raymond told police that Cooper had one lung. She complained that the cold weather was bothering her several times, but she claims that Davis and Blackwell told her that it would take awhile to get a search warrant. She testified that Raymond told Davis he would give the police his "stuff" if everyone could go back inside after they had already waited outside for about 35 minutes. Davis took Raymond to the car shed and spoke to him alone. Davis called Cooper over to the shed about five minutes later, and she signed a consent form and Miranda waiver. She claims that she signed the consent form because she wanted to get out of the cold.

Raymond testified that Cooper saw a truck come up the driveway and park next to the car shed, and she told Raymond. Raymond saw a man approaching the house and he identified the man as Davis. Davis tried to speak to Raymond through a window, but Raymond could not hear Davis and went to the front porch to speak to Davis. Davis asked Raymond if he knew someone named

Bob Chambers. He claims that Davis then stated that he smelled marijuana, but Raymond denied Davis' allegation. Davis allegedly threatened to detain everyone inside the house if Raymond did not let him in the house to search for marijuana. Davis also told Raymond that another option would be for Davis to get a search warrant, and Raymond agreed to let Davis "look around." Raymond testified that he opened the front door and asked Cooper to secure the dogs. Davis called Blackwell on his cell phone, and Raymond, Davis, and Blackwell entered the house. Raymond claims that Loftis was in a front room of the house, and Davis and Blackwell saw him immediately upon entering the house. According to Raymond, he waited with Loftis and Cooper in the kitchen while Davis and Blackwell searched the living room for about four or five minutes. Raymond asked Davis and Blackwell to stop searching, and Davis placed Raymond in handcuffs and stated that he would get a search warrant.

Raymond, Cooper, and Loftis waited outside, and Raymond mentioned at least twice that it was cold. He claims that Davis told Raymond he would have to wait for a search warrant and a dog catcher to arrive, and Davis would shoot the dogs if they presented any danger to himself or Blackwell. Raymond testified that he became concerned for Cooper's well-being, because she was visibly shaking from the cold. After 30 to 35 minutes, he said would give up his "stuff" if everyone could go back inside and he signed a <u>Miranda</u> waiver and consent form. He claims that he took Davis straight to the bathroom and showed Davis where his marijuana was hidden. He also took Davis to the master bedroom to show him where the guns were kept, but Raymond denies that he volunteered any statements about the obliterated serial numbers on the handgun.

**II.**

Defendant argues that the warrantless search of his house on January 6, 2010 violated his rights under the Fourth Amendment. Specifically, defendant argues that he did not voluntarily consent to a search of his home and, even if he did, his consent was tainted due to an intervening Fourth Amendment violation. He claims that Davis had no basis to place to defendant in handcuffs before escorting them outside, and this tainted his subsequent consent to a search of his home.

The Fourth Amendment ordinarily prohibits the warrantless search of a person's home as per se unreasonable. Georgia v. Randolph, 547 U.S. 103, 106 (2006); Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Police face a higher burden when entering a person's home, because "[f]reedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." Payton v. New York, 445 U.S. 573, 587 (1980). Police can enter a person's home with consent, even if probable cause does not exist, provided that the consent is "freely and voluntarily" given. United States v. Cruz-Mendez, 467 F.3d 1260, 1265 (10th Cir. 2006). A court must review the totality of the circumstances to determine if consent was voluntary. United States v. Santurio, 29 F.3d 550, 552 (10th Cir. 1994). The Tenth Circuit has articulated a two-part test to determine if consent is voluntary:

> First, the government must proffer "clear and positive testimony that consent was unequivocal and specific and freely and intelligently given." Furthermore, the government must prove that this consent was given without implied or express duress or coercion.

United States v. Angulo-Fernandez, 53 F.3d 1177, 1180 (10th Cir. 1995). The mere fact that police approached defendant's home to initiate the encounter does not create an inference that defendant's consent was obtained through coercion. United States v. Spence, 397 F.3d 1280, 1283 (10th Cir. 2005). The Tenth Circuit has identified a list of non-exclusive factors that are often relevant to determine if consent was voluntary:

> the location of the encounter, particularly whether the defendant is "in an open public place where he [is] within the view of persons other than law enforcement officers;" whether the officers "touch or physically restrain" the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically "advised defendant at any time that he had the right to terminate the encounter or refuse consent."

United States v. Zapata, 997 F.2d 751, 756-57 (10th Cir. 1993) (internal citations omitted).

The Court's analysis in this case is in three parts. First, the Court must determine whether defendant voluntarily consented to Davis' initial entry into the home. Second, defendant argues that the totality of the circumstances shows that he did not voluntarily agree to a full search of his home after being taken outdoors, and the Court must determine whether he voluntarily consented to the search. Finally, defendant argues that an intervening Fourth Amendment violation tainted his consent for a full search of his home and, if defendant establishes that his consent was tainted, the Court must determine whether the government has shown that the taint did not render defendant's subsequent consent involuntary.

The first issue is Davis' initial entry into the home, and defendant does not argue that this act was an independent Fourth Amendment violation. Whether the Court credits Davis' or defendant's testimony, the government has shown that defendant gave Davis limited consent to enter the home. According to Davis, he informed defendant that he detected an odor of burning marijuana and defendant admitted that he was smoking marijuana. Davis testified that he requested defendant's consent to enter the home, and defendant permitted Davis to come into the living room. Defendant testified that Davis was mistaken about presence of marijuana and he denied Davis' statement that he smelled marijuana. Defendant claims that Davis threatened to come back with a search warrant if defendant did not let Davis into the house. While this version of events suggests that the

encounter was less friendly than Davis suggests, there is nothing inherently improper about a police officer stating that he will request a warrant if this is a genuine statement. <u>United States v. Evans</u>, 27 F.3d 1219, 1231 (7th Cir. 1994). The Sheriff's Office had received several tips that a person was selling marijuana from the address and Davis testified that he smelled marijuana coming from the living room. The Court finds, and defendant has not disputed, that Davis had a legitimate basis to request a search warrant, and this was not an idle threat intended to coerce defendant into consenting to a search of his living room. Under either version of the events, defendant voluntarily permitted Davis to enter the home with at least consent to "look around" the living room. While defendant disputes that Davis found any marijuana in the living room, defendant does not assert that his consent to Davis' initial entry into the home was involuntary and this was not a Fourth Amendment violation.

The second issue - the voluntariness of defendant's consent to a full search of his home- turns on the credibility of witnesses. The Court finds that Davis' testimony is credible on the key points, even if defense counsel pointed out certain omissions in his testimony,[3] and Davis' testimony should be credited. A key fact in the testimony of each witness is the timeline of events, and Davis' timeline is substantially more credible. Davis testified that approximately ten to 20 minutes passed between the time that he escorted defendant, Cooper, and Loftis out of the house and defendant consented to the search. Defendant, Cooper, and Loftis each testified that this process took about

---

[3] Defendant established two omissions from Davis' testimony on direct examination. First, Davis did not mention that he initially approached the house and asked about "Bob" as his alleged reason for initiating conversation with defendant. Second, Davis failed to note that Loftis was present in the house. The Court finds that these omissions are not critical to Davis' overall testimony, and do not detract from Davis' credibility on key points of dispute between his version of events and the testimony of other witnesses.

40 minutes. Davis testified that he left for defendant's house around 2:30 p.m. Defendant executed a consent form and Miranda waiver at 2:57 p.m. This corroborates Davis' testimony that the total amount of time between his initial contact with defendant and defendant's consent to a full search of his house took approximately 10 to 20 minutes. Defendant and Cooper failed to identify any evidence corroborating their testimony that Davis made them wait outside for about 40 minutes. Cooper testified that it "felt like" 40 minutes, but this is not supported by any other evidence. In fact, defendant's and Cooper's testimony supports Davis' timeline. Cooper testified that police moved her handcuffs from behind her back to the front after she had been outside for about five minutes, because Cooper wanted to smoke a cigarette. Defendant clearly testified that he was already going over the paperwork with Davis when Cooper's handcuffs were moved from back to front to permit her to smoke a cigarette. This corroborates Davis' testimony that defendant consented to the search shortly after the house was secured in preparation for a search. Davis also testified that he did not actually take any steps to request a search warrant, although he fully anticipated that it would be necessary to request a warrant after escorting defendant, Cooper, and Loftis out of the house. This suggests that defendant agreed to consent before Davis could take any steps to request a warrant, and supports Davis's testimony concerning the timing of events. The Court credits Davis' testimony concerning the amount of time defendant, Cooper, and Loftis waited outside, and finds that defendant's, Cooper's, and Loftis' testimony on this point is not credible.

Defendant's written statement also corroborates Davis' version of events. The written statement shows that defendant voluntarily consented to a search of his home, and that he voluntarily gave Davis his "smoke." Government Exhibit No. 3. If defendant felt that Davis' conduct was unreasonable, it is more likely that he would have refused to give a written statement or would have

made some mention of his complaints in his written statement. The written statement provides further corroboration of Davis' testimony.

Cooper's and defendant's testimony about the events of January 6, 2010 is not credible on certain key points, and this detracts from the credibility of their overall testimony about Davis' conduct. Cooper generally seemed concerned with showing that Davis and Blackwell were acting recklessly at every stage of the encounter. For example, she explained in detail how Davis and Blackwell drove off of the driveway and parked their truck in a place that defendant did not intend for visitors to park. There is nothing unreasonable about the officers' conduct. It would have been more suspicious if the officers had parked behind the shed and hidden their truck from view. It is also reasonable for the officers to park with a line of sight to the house, because Davis approached the house alone and Blackwell could not have known if backup would be necessary. Cooper testified that she repeatedly mentioned that she was cold, but officers were indifferent to her complaints. However, no one clearly explained to Davis or Blackwell that she suffered from emphysema, and there is no evidence that Davis or Blackwell intentionally made defendant or Cooper uncomfortable to coerce consent for a search of the home. The government argues that defendant and Cooper's demeanor during their testimony and their bias should be considered as factors weighing against their credibility, and the Court agrees that these are relevant factors when assessing defendant's and Cooper's testimony. In particular, Cooper seemed to have a difficult time recalling important details and this detracted from her credibility as a witness.

The Court also finds that Loftis' testimony is unhelpful to defendant, because Loftis freely acknowledged that he did not understand what was happening and he had no way to accurately assess how long he waited outside before he went home. However, Loftis contradicts defendant and

Cooper on at least two points. Both defendant and Cooper testified that Davis raised his voice at the front door and inside the house, and threatened to detain the occupants of the house until another officer arrived with a search warrant. Loftis testified that he did not hear any raised voices and he believed that defendant was cooperating with Davis during the initial encounter. There is also some dispute among defendant's, Cooper's, and Loftis' testimony about Loftis' location during Davis' initial entry into the house. Cooper's and defendant's testimony suggest that police were immediately aware of Loftis' presence and made him wait in the kitchen the entire time. However, Loftis testified that he remained in a bedroom for some time and the police did not realize that he was present. Loftis' testimony does not support defendant's version of events, and it generally supports Davis' testimony that Loftis' presence was irrelevant.

Applying the Zapata factors, the Court finds that defendant's consent to the full search of the house was voluntary. The encounter initially started at defendant's home and this is not an "open public place." However, Davis and Blackwell moved defendant, Cooper, and Loftis outdoors, and this was a more public location. The Court also notes that Loftis was present. It appears that he was treated as a neutral observer to the events, and there was at least one other person present who could confirm or deny if Davis and Blackwell engaged in any illegal conduct. There is no indication that the location of the encounter had any effect on the voluntariness of defendant's consent. Davis and Blackwell did place defendant and Cooper in handcuffs and, combined with the cold weather, defendant's and Cooper's testimony that they were uncomfortable is credible. The fact that defendant and Cooper were in handcuffs also shows that they were not free to leave. The encounter may not have lasted as long as defendant or Cooper claim, but the facts that they were in some form of detention and waited outside in the cold for a period of time are not in dispute. The officers were

in plain clothes and drove an unmarked vehicle, but there is no evidence suggesting that they ever displayed a weapon. There were two police officers present, and this was not an excessive number of police officers. The length of the detention was not excessive. The Court has determined that defendant, Cooper, and Loftis were not required to wait outside more than 20 minutes, and perhaps as little as 10 minutes. Neither Davis nor Blackwell retained any of defendant's personal effects, but there is no dispute that defendant and Cooper could not have re-entered the house until another officer arrived with a search warrant or they consented to the search. The consent forms executed by defendant and Cooper clearly state that they could refuse to consent to the search, and they were advised of their right to refuse to give their consent. Defendant argues that the length of the detention, the use of handcuffs, and the weather coerced him into consenting to the full search of his home. However, this is not supported by the evidence. Defendant's testimony overstates the length of the detention, and it appears that he very readily gave his consent to the search without being required to wait outdoors for a significant length of time. The use of handcuffs was warranted, because Davis testified that he found marijuana and drug paraphernalia in defendant's house. Considering the totality of the circumstances, the Court finds that defendant's consent was freely and voluntarily given, and defendant's consent was not the result of express or implied coercion.

Even if the Court finds that defendant voluntarily consented to a search of his house, defendant argues that his consent is tainted due to Davis' and Blackwell's illegal handcuffing of defendant and Cooper after the initial entry into the home. If a defendant has established that the police illegally detained him prior to his consent to search, there is a concern that the illegal detention tainted the defendant's subsequent consent. United States v. Melendez-Garcia, 28 F.3d 1046, 1054 (10th Cir. 1994). In Brown v. Illinois, 422 U.S. 590 (1975), the Supreme Court

14

articulated three factors that a court should apply to determine if otherwise voluntary consent has been tainted by an intervening Fourth Amendment violation: (1) the temporal proximity between the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the misconduct. Id. at 603-04. The government bears the burden to prove that "the taint of an illegal seizure has dissipated," and the Court must consider from the totality of the circumstances if the causal connection from the illegal conduct has been broken. United States v. Fox, 600 F.3d 1253, 1260 (10th Cir. 2010).

Defendant appears to be arguing that his removal from the house after the initial encounter was an investigative detention, but the use of handcuffs escalated the encounter from an investigative detention to an arrest. Defendant's theory appears to be that Davis did not have probable cause to arrest defendant, and the arrest was an intervening violation of the Fourth Amendment.[4] There are three types on encounters that may occur between police and private citizens: (1) consensual encounters; (2) investigative stops; and (3) arrests. Cortez v. McCauley, 478 F.3d 1108, 1115 (10th Cir. 2007). A consensual encounter is not Fourth Amendment conduct and is not at issue in this case. Id. Investigative detentions, which are Fourth Amendment seizures of limited scope and duration, are lawful if they are supported by a reasonable suspicion that the detained individual is engaged in criminal activity. Novitsky v. City of Aurora, 491 F.3d 1244, 1253 (10th Cir. 2007). The use of force, such as handcuffs or firearms, is a greater level of force than is permitted in an ordinary investigative detention, and requires the government to demonstrate that "the facts available to the officer would 'warrant a man of reasonable caution in the belief'" that the

---

[4] The Court characterizes defendant's argument in this manner, because the case cited by defendant does not support his argument that "handcuffing" is an independent Fourth Amendment violation. See Melendez-Garcia, 28 F.3d at 1052.

action taken was appropriate.'" Melendez-Garcia, 28 F.3d at 1052.  An arrest is the most intrusive invasion of a person's liberty among the three types of encounters.  "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been is or is being committed." United States v. Turner, 553 F.3d 1337, 1344 (10th Cir. 2009).

The Court has determined that Davis's testimony was credible and, based on Davis' testimony, the Court finds that no intervening Fourth Amendment violation occurred. Davis had sufficient evidence to establish probable cause that either defendant or Cooper or both had committed a drug offense, and his use of handcuffs was reasonable.  "An officer has probable cause to arrest if, under the totality of the circumstances, he learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1227 (10th Cir. 2007).  Davis and Blackwell came to defendant's house based on several tips or reports that someone was selling marijuana from the residence.  When Davis approached the house, he smelled marijuana immediately after defendant opened the door.  Davis found drug paraphernalia and marijuana in the house, and defendant admitted to smoking a "little bit" of marijuana.  This clearly establishes probable cause for Davis to believe that one or more occupants of the house possessed marijuana and related drug paraphernalia.  Even if the use of handcuffs escalated the encounter from an investigative detention to arrest, the evidence supports a finding of probable cause and Davis could have arrested both defendant and Cooper.  Thus, defendant and Cooper were not illegally detained before they were taken outside, and there is no taint of defendant's or Cooper's subsequent consent for the search of the house.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress and Brief in Support (Dkt. # 12) is **denied**.

**DATED** this 14th day of May, 2010.

                                                                                     CLAIRE V. EAGAN, CHIEF JUDGE
                                                                                     UNITED STATES DISTRICT COURT